'09 CIV 7913

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X  Case No.

JAMES KENNEY, Derivatively on                          :
Behalf of PFIZER, INC.,                                :

                Plaintiff,    :    VERIFIED SHAREHOLDER
                              :    DERIVATIVE COMPLAINT FOR
                              :    BREACH OF FIDUCIARY DUTY AND
              v.    :    UNJUST ENRICHMENT

JEFFREY B. KINDLER, DOUGLAS M.                         :
LANKLER, DENNIS A. AUSIELLO,                           :
MICHAEL S. BROWN, ROBERT N. BURT, W.:
DON CORNWELL, CONSTANCE J. HORNER,:
JAMES M. KILTS, DANA G. MEAD,                          :
SUZANNE NORA JOHNSON, HENRY A.                         :
MCKINNELL, DAVID L. SHEDLARZ,                          :
WILLIAM R. HOWELL, STANLEY O.                          :
IKENBERRY, FRANKLIN D. RAINES, RUTH :
J. SIMMONS, AND JEAN-PAUL VALLÉS,                      :

              Defendants,    :

          and    :

PFIZER, INC., a Delaware corporation,                  :

        Nominal Defendant.    :
---------------------------------------------------------X    DEMAND FOR JURY TRIAL



RECEIVED
SEP 15 2009
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff James Kenney ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint for the benefit of nominal defendant Pfizer, Inc. ("Pfizer" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' violations of state law, including breaches of fiduciary duties and unjust enrichment from August 2004 to the present (the "Relevant Period").

## NATURE AND SUMMARY OF THE ACTION

1.    Towards the end of the drug developmental process, pharmaceutical companies submit drugs for approval to the U.S. Food and Drug Administration ("FDA"). When a pharmaceutical company submits a drug, it specifies the particular purpose for which the drug is to be used. Usually, there is extensive testing of the drug to support its use for this purpose. If it finds the drug's benefits outweigh the risks, the FDA approves its use for the specified purpose. The specific approved use is called the "indication" for which the drug may be prescribed. The FDA will specify particular dosages determined to be safe and effective for each indication.

2.    The indications and dosages approved by the FDA are set forth on the drug's labeling, the content of which must be received and approved of by the FDA. The FDA will only approve a new drug after confirming that the label conforms to the indications and dosages that the FDA has approved.

3.    Even though the FDA approves a drug for a particular use, however, doctors are free to prescribe it for other uses, known as "off-label" use. Off-label use includes not only treating a condition not indicated on label, but also prescribing a different dosage than specified on the label or treating a different patient population. Off-label prescriptions of a drug can significantly increase its use, and correspondingly, the income to the pharmaceutical company that makes the drug.

4.    However, there are obvious dangers in prescribing a drug for unapproved, and many times untested, use. Accordingly, the Food, Drug, and Cosmetics Act ("FDCA") prohibits a pharmaceutical company from promoting the off-label use of its drug or from making misleading claims as to a drug's safety or effectiveness. Specifically, a manufacturer may not

introduce a drug into interstate commerce with an intent that it be used for an off-label purpose and a manufacturer illegally "misbrands" a drug if the drug's labeling (which includes all marketing and promotional materials relating to the drugs) describes intended uses for the drug that have not been approved by the FDA. Further, there are restrictions on "indirect" marketing of off-label uses through a pharmaceutical company's dissemination of medical and scientific publication concerning the off-label use of its drugs and a pharmaceutical company's support of a Continuing Medical Education ("CME") program that focuses on off-label uses.

5.    In addition to the restrictions on promoting off-label use, federal and state law prevent drug manufacturers from trying to induce health care professionals to prescribe their particular drug through incentives, such as gifts or fees.

6.    It is a violation of the Federal False Claims Act to make or cause false or fraudulent claims to be made to the United States in connection with any program which is funded in whole or in part by the United States, such as Medicaid and Medicare. In most circumstances, it is a violation of the Federal False Claims Act to submit a claim for reimbursement from a government program for an off-label use of a drug.

7.    The Board and executive officers of Pfizer, the world's largest research-based pharmaceutical company, are well aware of these laws. Besides these laws being an integral part of the Company's business, between 2002 and 2007, Pfizer entered into three separate settlements with the United States government over violations of the Federal False Claim Act, the FDCA, and the anti-kickback statutes regarding the activities of certain of its subsidiaries before the Company acquired them. These settlements cost the Company approximately half a billion dollars. Further, the Company entered into two corporate integrity agreements with the government agreeing to set up controls to prevent future violations of federal and state law.

8.    Despite the knowledge of these laws and the settlements mentioned above, between January 1, 2001 and October 8, 2008, employees of Pfizer engaged in a prevalent and company-wide scheme to illegally promote four of Pfizer's drugs for off-label use (Bextra, Geodon, Zyvox, and Lyrica) and attempt to induce health providers to prescribe those four and

nine others (Aricept, Celebrex, Lipitor, Norvasc, Relpac, Viagra, Zithromax, and Zyrtec) through illegal kickbacks.

9.     The illegal practices at Pfizer were so widespread and blatant that former employees of the Company filed eleven different whistleblower complaints against the Company. These whistleblower complaints in turn set in motion an investigation into Pfizer's off-label promotions and illegal kickback by the United States Department of Justice ("DOJ").

10.     The scope and breadth of Pfizer's illegal off-label promotions activities were shocking. The scheme occurred for nearly a decade and infected almost every aspect of Pfizer's U.S. marketing operations. What makes this scheme particularly galling is that Pfizer violated the exact same laws that its subsidiaries violated and that the Company was in the process of settling. Moreover between 2002 through 2007, the FDA sent at least four letters to Pfizer stating that its marketing was misleading and improperly promoted off-label uses of Bextra, Geodon and Zyvox, including one letter directly to the Chairman of the Board of Pfizer at that time. As a result of the DOJ's findings, Pfizer and its subsidiaries were fined $2.3 billion, one of its subsidiaries pled guilty to a felony violation of the FDCA and the Company was forced to agree to another comprehensive corporate integrity agreement. The $2.3 billion fine included the largest criminal fine ever imposed in a criminal action. Notably, and underscoring the validity of their complaints, 6 of the whistleblowers were paid a combined $100 million for bringing these actions to the DOJ's attention.

11.     Acting U.S. Attorney for the District of Massachusetts Mike Loucks, explained that "Pfizer violated the law over an extensive time period. Furthermore, at the very same time Pfizer was in our office negotiating and resolving the allegations of criminal conduct by its then newly acquired subsidiary, Warner-Lambert, Pfizer was itself in its other operations violating those very same laws. Today's enormous fine demonstrates that such blatant and continued disregard of the law will not be tolerated."

12.     The three settlements between 2002 and 2007 regarding Pfizer's subsidiaries' violations of federal law were unmistakable warnings that the Company's internal controls needed to be checked to ensure compliance with federal law. Moreover, the four letters sent to

Pfizer by the FDA showed that the Company was currently violating federal law. Despite these facts, the defendants, as defined herein, consciously decided to take no steps or blatantly inadequate steps to stop and prevent further violations of federal law in breach of their fiduciary duty. Accordingly, this action now seeks to hold those ultimately accountable for the damages alleged herein.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over all counts asserted herein pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.

14.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by this District permissible under the traditional notions of fair play and substantial justice.

15.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrong complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District, Pfizer is headquartered here, many of the witnesses reside in this District and defendants conduct substantial business activities in this District.

## THE PARTIES

16.    Plaintiff James Kenney has held Pfizer common stock continuously since August 2004. Plaintiff is a citizen of Florida.

17.    Nominal defendant Pfizer is a Delaware corporation headquartered in New York, New York. According to its public filings, Pfizer "engages in the discovery, development, manufacture, and marketing of prescription medicines for humans and animals worldwide."

18.    Defendant Jeffrey B. Kindler ("Kindler") is Pfizer's Chief Executive Officer and a director and has been since July 2006. Kindler is also Pfizer's Chairman and has been since

December 2006. Kindler was Pfizer's Vice Chairman and General Counsel from March 2005 to July 2006; Chief Compliance Officer from at least August 2005 to at least March 2007; Executive Vice President and General Counsel from April 2004 to March 2005; and Senior Vice President and General Counsel from January 2002 to April 2004. Pfizer paid Kindler the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2008 | $1,575,000 | - | $4,715,947 | $3,281,916 | $3,000,000 | $759,298 | $438,261 |
| 2007 | $1,462,500 | $3,100,000 | $1,162,835 | $2,868,866 | - | $477,783 | $441,456 |
| 2006 | $1,103,883 | $3,300,000 | $2,736,265 | $1,971,676 | - | $422,091 | $265,318 |

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2005 | $902,200 | $1,000,000 | $99,379 | - | 261,000 | $1,041,418 | $79,731 |
| 2004 | $887,300 | $869,600 | $7,388 | $792,561 | 225,000 | $1,319,472 | $80,496 |

Defendant Kindler is a citizen of Connecticut.

19.    Defendant Douglas M. Lankler ("Lankler") is Pfizer's Senior Vice President, Associate General Counsel and Chief Compliance Officer and has been since at least April 2008. Defendant Lankler is a citizen of New York.

20.    Defendant Dennis A. Ausiello ("Ausiello") is a Pfizer director and has been since December 2006. Ausiello is also a member of Pfizer's Corporate Governance Committee and has been since 2007 and a member of the Audit Committee and has been since 2009. Defendant Ausiello is a citizen of Massachusetts.

21.    Defendant Michael S. Brown ("Brown") is a Pfizer director and has been since 1996. Brown is also a member of Pfizer's Corporate Governance Committee and has been since at least 2003. Defendant Brown is a citizen of Texas.

22:    Defendant Robert N. Burt ("Burt") is a Pfizer director and has been since 2000. Burt is also a member of Pfizer's Compensation Committee and has been since 2005. Burt was

Chairman of Pfizer's Audit Committee from at least 2003 to April 2005. Defendant Burt is a citizen of Illinois.

23.     Defendant W. Don Cornwell ("Cornwell") is a Pfizer director and has been since 1997. Cornwell is also Chairman of Pfizer's Audit Committee and has been since 2007 and a member of the Compensation Committee and has been since 2009. Cornwell was a member of Pfizer's Audit Committee from at least 2003 to 2007. Defendant Cornwell is a citizen of New York.

24.     Defendant Constance J. Horner ("Horner") is Pfizer's Lead Director and has been since February 2007 and a director and has been since 1993. Horner is also a member of the Corporate Governance Committee and has been since 2009. Horner was Chairman of Pfizer's Corporate Governance Committee from 2006 to 2008; a member from 2004 to 2006; and Chairman during at least 2003. Defendant Horner is a citizen of the District of Columbia.

25.     Defendant James M. Kilts ("Kilts") is a Pfizer director and has been since September 2007. Kilts is also a member of Pfizer's Compensation Committee and has been since 2007. Defendant Kilts is a citizen of Pennsylvania.

26.     Defendant Dana G. Mead ("Mead") is a Pfizer director and has been since 1998. Mead is also Chairman of Pfizer's Compensation Committee and has been since January 2005. Mead was a member of Pfizer's Compensation Committee from at least 2003 to January 2005. Defendant Mead is a citizen of Massachusetts.

27.     Defendant Suzanne Nora Johnson ("Johnson") is a Pfizer director and has been since September 2007. Johnson is also a member of Pfizer's Audit Committee and has been since 2007 and a member of the Compensation Committee and has been since 2009. Defendant Johnson is a citizen of California.

28.     Defendant Henry A. McKinnell ("McKinnell") was a Pfizer director from June 1997 to February 2007. McKinnell was also Pfizer's Chairman of the Board from May 2001 to December 2006; Chief Executive Officer from January 2001 to July 2006; President from May 1999 to May 2001; President, Pfizer Pharmaceuticals Group from January 1997 to April 2001; Chief Operating Officer from May 1999 to December 2000; Executive Vice President from 1992

to 1999; and served in various other positions at Pfizer from 1971 to 1992. Pfizer paid McKinnell the following compensation:

| Fiscal Year | Salary | Stock Awards | Option Awards | All Other Compensation |
|---|---|---|---|---|
| 2006 | $2,270,500 | $8,315,642 | $8,448,787 | $383,517 |

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2005 | $2,270,500 | $3,700,000 | $145,814 | - | 880,000 | $5,489,400 | $281,556 |
| 2004 | $2,224,900 | $3,986,300 | $19,482 | $4,292,181 | 525,000 | $5,829,120 | $307,454 |

Defendant McKinnell is a citizen of Wyoming.

29.    Defendant David L. Shedlarz ("Shedlarz") was Pfizer's Vice Chairman from March 2005 to December 2007. Shedlarz was also Pfizer's Chief Financial Officer from June 1995 to March 2005; Executive Vice President from May 1999 to March 2005; Senior Vice President of Pfizer's former Medical Technology Group from January 1997 to at least 1999; Vice President, Finance from 1992 to at least November 1996; Vice President, Finance of the U.S. Pharmaceuticals group from 1989 to 1992; and served in various other positions at Pfizer including Group Controller, Assistant Group Controller – U.S. Pharmaceuticals Division, Production Controller of the U.S. Pharmaceuticals Division, Senior Financial Analyst, and financial manager and controller of the Marketing/Sales/Production, Diagnostics Division from 1976 to 1989. Pfizer paid Shedlarz the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2007 | $1,056,875 | $951,200 | $62,339 | $1,795,864 | $13,104,860 | $188,766 |
| 2006 | $1,008,225 | $1,263,400 | $3,181,563 | $3,255,375 | $1,381,064 | $185,843 |

| Fiscal Year | Salary | Bonus | Other Annual Compensation | Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2005 | $983,100 | $1,088,000 | $99,193 | - | 301,000 | $2,316,527 | $89,473 |
| 2004 | $966,500 | $1,005,200 | $11,405 | $1,873,326 | 275,000 | $2,521,728 | $90,432 |

Defendant Shedlarz is a citizen of New York.

30.    Defendant William R. Howell ("Howell") was a Pfizer director from June 2000 to April 2009. Howell was also a member of Pfizer's Audit Committee from 2005 to at least 2008 and served as Chairman of the Audit Committee from April 2005 to 2006. Defendant Howell is a citizen of Wyoming.

31.    Defendant Stanley O. Ikenberry ("Ikenberry") was Pfizer's Lead Independent Director from October 2005 to February 2007 and a director from 1982 to March 2007. Ikenberry was also a member of Pfizer's Compensation Committee from 2005 to at least 2006 and a member of the Corporate Governance Committee from at least 2003 to 2004. Defendant Ikenberry is a citizen of Illinois.

32.    Defendant Franklin D. Raines ("Raines") was a Pfizer director from August 1993 to 1996 and again from October 1998 to April 2005. Raines was also a member of Pfizer's Compensation Committee from at least 2003 to 2004. Defendant Raines is a citizen of the District of Columbia.

33.    Defendant Ruth J. Simmons ("Simmons") was a Pfizer director from January 1997 to April 2007. Simmons was also a member of the Corporate Governance Committee from at least 2003 to 2006 and served as Chairman of the Corporate Governance Committee from at least 2004 to 2005. Defendant Simmons is a citizen of Texas.

34.    Defendant Jean-Paul Vallés ("Vallés") was a Pfizer director from 1980 to June 2005 and Vice Chairman from March 1992 to October 1992. Vallés was also a member of Pfizer's Audit Committee from at least 2003 to 2004. Defendant Vallés is a citizen of New York.

35.    The defendants identified in ¶¶18-34 are referred to as the "Individual Defendants." The defendants identified in ¶¶18-19, 28-29 are referred to as the "Officer Defendants."

## THE INDIVIDUAL DEFENDANTS' DUTIES

36.    By reason of their positions as officers, directors, and/or fiduciaries of Pfizer and because of their ability to control the business and corporate affairs of Pfizer, the Individual Defendants owed Pfizer and its shareholders fiduciary obligations of good faith, loyalty, candor, and care and were and are required to use their utmost ability to control and manage Pfizer in a

fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Pfizer and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefits. Each director and officer of the Company owes to Pfizer and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Pfizer, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.     To discharge their duties, the officers and directors of Pfizer were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Pfizer were required to, among other things:

(a)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c)     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

39.     According the Company's Code of Business Conduct and Ethics for Directors (the "Code"), which the Board agreed to abide by as part of the 2004 Corporate Integrity Agreement with the United States Department of Health and Human Services Office of Inspector General ("OIG"), and which has not changed in any relevant way since, every director must:

(a)    comply and oversee compliance by employees, officers and other directors with laws, rules and regulations applicable to the Company;

(b)    deal fairly and oversee fair dealing by employees and officers, with the Company's customers, suppliers, competitors and employees, and

(c)    encourage the reporting of any illegal or unethical behavior, including taking steps to ensure the Company informs employees that Pfizer will not allow retaliation for reports made in good faith.

40.    According to the Charter of the Audit Committee that has been in place since at least 2004, the Audit Committee Defendants were and are responsible for, among other things:

(a)    overseeing the integrity of the Company's internal controls;

(b)    overseeing the Company's compliance with legal and regulatory requirements;

(c)    discussing Company policies with respect to risk assessment and risk management, and review contingent liabilities and risk that may be material to the Company;

(d)    reviewing the status of compliance with laws, regulations, and internal procedures; and

(e)    reviewing the scope and status of systems designed to promote Company compliance with laws, regulations and internal procedures.

41.    Further, the members of the Corporate Governance Committee are required to:

(a)    consider matters of corporate governance; and

(b)    maintain an informed status on Company issues related to corporate social responsibility.

## APPLICABLE LAWS AND REGULATIONS

42.    The FDCA prohibits the distribution of new pharmaceutical drugs in interstate commerce unless the FDA has determined that the drug is safe and effective for its intended use. An approved drug may be prescribed by doctors for uses other than those approved by the FDA, but manufacturers are prohibited from marketing or promoting the drug for such unapproved or

off-label uses. If the manufacturer intends to promote the drug for a new unapproved use, the drug must go through the FDA approval process for the new intended use.

43.     In most situations, the FDCA also prohibits the dissemination of certain written information to health care providers regarding the safety, effectiveness, or benefit of an off-label use of a drug by the drug's manufacturer.

44.     There are also restrictions on "indirect" marketing of off-label uses through a pharmaceutical company's dissemination of medical and scientific publication concerning the off-label use of its drugs and a pharmaceutical company's support of a CME program that focuses on off-label uses.

45.     In most circumstances, federal reimbursement for prescription drugs under Medicare, Medicaid and other governmental programs is available only for "covered outpatient drugs." Covered outpatient drugs do not include drugs that are used for an indication which is not a medically accepted indication. A medically accept indication includes the use the drug is approved for under the FDCA or which is included in a specified drug compendium. There is an exception when an individual state has determined that the off-label use of a drug is essential to the health of beneficiaries.

46.     Under the Federal False Claims Act, knowingly presenting or causing to be presented to the United States any false of fraudulent claim for payment is a violation of federal law. Knowingly includes making, using or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the government. "Claim" includes any request or demand, whether under contract or otherwise, for money or property which is made to a contractor grantee or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. The United States may recover for a violation of the Federal False Claims Act three times the amount of the damage the government sustained and a civil monetary penalty.

47.    Finally, under the federal anti-kickback laws, it is illegal to offer, receive, or solicit any remuneration, kickback, bribe or rebate, whether directly or indirectly, overtly or covertly, in cash or in kind, to or from any person in order to induce such person to purchase, lease or order, or to arrange for or recommend the purchasing, leasing or order of any good, service or item for which payment may be made in whole or in part under a government health care program.

### PFIZER'S PREVIOUS SETTLEMENTS WITH THE GOVERNMENT

*2002 Lipitor Settlement and Corporate Integrity Agreement*

48.    On October 28, 2002, Pfizer entered into a settlement with the DOJ to resolve a civil investigation that its subsidiary, Warner-Lambert Co. ("Warner-Lambert"), prior to its acquisition by Pfizer, fraudulently avoided paying the full rebates owed to state and federal governments under the national drug Medicaid Rebate Program for the cholesterol-lowering drug Lipitor.

49.    As part of the settlement, Pfizer agreed to pay $49 million and enter into a Corporate Integrity Agreement with the OIG.  The Corporate Integrity Agreement included requirements that Pfizer maintain internal procedures designed to prevent future problems in compliance with the Medicaid program.

50.    Key points of the Corporate Integrity Agreement include that:

(a)    the Company must continue to have a compliance officer;

(b)    the compliance officer must be a senior member of management at Pfizer,

(c)    the compliance officer must make at least semi-annual reports to the Board about Pfizer's compliance; and

(d)    within 90 days of entering into the Corporate Integrity Agreement, Pfizer needed to retain an entity to assist it in assessing and evaluating its systems, processes, policies and practices related to the Medicaid Rebate Program and to Managed Care Contracting.

*2004 Neurontin Settlement and Corporate Integrity Agreement*

51.    On May 13, 2004, Pfizer agreed to pay approximately $430 million in fines and its subsidiary, Warner-Lambert, pled guilty to two counts of violating the FDCA in order to

settle charges that Warner-Lambert, prior to its acquisition by Pfizer, promoted the off-label use of its drug Neurontin and illegally paid remuneration to doctors to induce them to promote and prescribe Neurotin for off-label use.

52.    According to the government's allegation, Warner-Lambert promoted Neurontin for off-label uses even when scientific studies had shown it was not effective and the FDA did not approve it for that use. For example, Warner-Lambert promoted Neurontin as effective as the sole drug (monotherapy) for epileptic seizures, even after solo use of the drug had been specifically rejected by the FDA. Similarly, Warner-Lambert falsely promoted Neurontin as effective for treating bipolar disease, even when a scientific study demonstrated that a placebo worked as well or better than the drug.

53.    In addition, Warner-Lambert paid doctors to attend consultants' meetings where they received a fee for attending dinners or conferences where presentations about the off-label use of Neurontin were made, a violation of the federal anti-kickback laws.

54.    In addition to the monetary settlement and Warner-Lambert's guilty plea, Pfizer entered into a second Corporate Integrity Agreement that incorporated and superseded the previous Corporate Integrity Agreement. The Corporate Integrity Agreement required that:

(a)    the compliance officer position must continue during the term of the Corporate Integrity Agreement (5 years);

(b)    the compliance officer and deputy compliance officer hold at least semi-annual meetings with the Board;

(c)    the directors are notified of Pfizer's continuing activities and obligations under the Corporate Integrity Agreement by the compliance officer;

(d)    the directors agree to abide by the code of conduct, which states that they "must comply, and oversee compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company";

(e)    Pfizer    retain an independent review organization to assist Pfizer in assessing and evaluating its systems, processes, policies and practices related to the Medicaid

Rebate Program, the Managed Care Contracting Related Functions and its promotional and product services related functions; and

(f)     Pfizer implement a disclosure program that emphasizes a nonretribution and nonretaliation policy.

### 2007 Genotropin Deferred Prosecution and Plea Agreement

55.     On March 27, 2007, Pfizer entered into a deferred prosecution agreement and its subsidiary, Pharmacia & Upjohn ("Pharmacia"), pled guilty to charges that, prior to its acquisition by Pfizer, Pharmacia promoted the off-label use of its drug Genotropin in violation of the FDCA. In particular, Pharmacia promoted, sold and distributed Genotropin for anti-aging, cosmetic and athletic performance uses, even though Genotropin was only approved for growth related diseases.

56.     In order to settle the investigation, Pfizer agreed to pay a $35 million fine.

## PFIZER ENGAGES IN A MULTI-YEAR SCHEME THAT VIOLATES FEDERAL LAW

### Bextra

57.     Bextra was approved in 2001 by the FDA for the signs and symptoms associated with osteoarthritis, rheumatoid arthritis and primary dysmenorrheal. The FDA explicitly refused to approve Bextra for acute pain, including the prevention of operative pain. Nevertheless, from 2002 through April 2005, Pfizer used false and misleading claims of safety and efficacy to promote Bextra for unapproved uses and for dosages above the approved level, including for acute and surgical pain.

58.     According to the settlement with the government and numerous whistleblower complaints, Pfizer promoted Bextra for off-label uses by:

(a)     creating sales materials and messages to promote Bextra for these uses for acute pain, surgical pain, and other unapproved uses, commissioned market research to test its sales materials, confirmed these unapproved messages, and allowed the promotion of Bextra for these purposes to continue. In such documents, Pfizer's marketing team stated as the "intended" use and message for Bextra that Bextra was for "acute pain";

- 14 -

(b)      Pfizer's sales force promoted Bextra directly to physicians for these unapproved uses and dosages, including by drafting and distributing proposed physician standing orders and hospital wide protocols and pain pathways that called for unapproved uses of Bextra;

(c)      Pfizer and Pharmacia used so-called advisory boards, consultant meetings and other forums and remuneration, including travel to lavish resorts, to promote Bextra to medical prescribers for unapproved uses and dosages and with false and misleading claims as to its safety and efficacy;

(d)      Pfizer's sales force created sham requests from physicians for medical information in order to send unsolicited information to physicians about unapproved uses and dosages;

(e)      Pfizer's sales force provided promotional samples and otherwise promoted Bextra for unapproved uses and dosages to surgeons and other medical prescribers who had no FDA-approved use for the Bextra samples, or at that dosage;

(f)      Pfizer sponsored purportedly independent CMEs to disseminate specific messages about unapproved uses of Bextra, including promoting the use of Bextra for acute pain and surgical pain; and

(g)      Pfizer also promoted Bextra for unapproved uses and dosages by initiating, funding and sometimes drafting articles about Bextra for unapproved uses without appropriate disclosures of Pfizer's role.

59.     Executives at Pfizer were warned about the off-label promotions of Bextra.  On January 1, 2005, the Division of Drug Marketing, Advertising, and Communication of the FDA ("DDMAC") sent a letter to Pfizer's vice president of regulatory affairs.  The letter explained that the promotional brochure Pfizer created regarding Bextra improperly detailed the safety risks associated with use of Bextra.  In particular, the letter noted that the brochure suggested that "Bextra provides significant protection from serious GI side effects.  However, these safety claims are inconsistent with the Warning in the Bextra PI regarding serious and life-threatening GI side effects, including bleeding in the stomach and intestines."

60.     The off-label promotion of Bextra caused Pfizer significant harm.   Pfizer's subsidiary Pharmacia agreed to plead guilty to a felony violation of the FDCA for misbranding Bextra with the intent to defraud or mislead. Pfizer will pay a criminal fine of $1.195 billion, the largest criminal fine ever imposed in the United States for any matter. Further, Pharmacia will forfeit $105 million, for a total criminal resolution of $1.3 billion

*Geodon*

61.     Geodon is an anti-psychotic drug initially approved for treating acute manifestations of schizophrenia and later expanded its approval for use in acute bipolar mania. Between January 1, 2001 through December 31, 2007, Pfizer marketed the drug for use in patients with depression, bipolar maintenance, mood disorder, anxiety, aggression, dementia, attention deficit hyperactivity disorder, obsessive compulsive disorder, autism and post-traumatic stress disorder, none of which were approved uses for Geodon. The Company also promoted Geodon's use in unapproved patients, including pediatric and adolescent patients, and promoted the drug for higher dosages than were approved by the FDA.

62.     In addition, according to allegations in whistleblower complaints, Pfizer sponsored promotion speaker programs to make presentations of off-label use of Geodon.

63.     This conduct included direct promotion by Pfizer sales representatives and the hiring of physicians to give promotional talks to other physicians about unapproved uses and dosages of Geodon.  These talks included encouraging doctors to prescribe the drug for children and to prescribe the drug at substantially higher than approved dosages.

64.     On September 3, 2002, the DDMAC sent a letter to Pfizer's vice president of regulatory affairs stating that the Company's promotional materials for Geodon misleadingly suggested that the drug was safer than demonstrated. Further, the letter stated that Geodon was being promoted for treating depression, an off-label use.

65.     On July 16, 2007, the DDMAC sent another letter to Pfizer regarding a misleading Geodon journal advertisement. The letter states that the journal advertisement omits important risk information, contains unsubstantiated superiority claims and thus is in violation of the FDCA.

66.     Despite both of these warnings, Pfizer continued to promote Geodon for off-label use. Allegations in whistleblower complaints show the widespread and continuous off-label promotions of Geodon. For instance, in November 2002, during a meeting of Pfizer sales managers, Pfizer's national head of Geodon marketing announced that Pfizer planned to grow use of the drug by promoting its use beyond its indicated market. In a video distributed in June 2007 to sales representatives to teach sales practices, a Pfizer sales representative stated that Geodon "works for 55 weeks in bipolar disorder patients." Geodon, however, has never been approved for such continued usage.

67.     The off-label promotions of Geodon caused significant harm to Pfizer. Of the record $2.3 billion settlement, $301 million was attributable to Pfizer's off-label marketing of Geodon.

*Zyvox*

68.     Zyvox is an antibacterial agent that is approved by the FDA to treat certain types of infections, including nosocomial pneumonia caused by methicillin-resistant staphylococcus aureus (a difficult to treat type of a staph infection).

69.     Between January 1, 2001, through February 28, 2008, Pfizer: (a) illegally promoted the sale and use of Zyvox for a variety of off-label conditions; (b) made and/or disseminated unsubstantiated and/or false representations or statements about the safety and efficacy of Zyvox and (c) offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe Zyvox.

70.     On July 20, 2005, the DDMAC sent a letter to defendant McKinnell, then the Chairman and Chief Executive Officer of Pfizer. In that letter, the DDMAC explained that Pfizer's ad for Zyvox in a professional journal misbranded the drug in violation of the FDCA. The misbranding included presented unsubstantial implied superiority, lack of important risk information, and a broadening of the scope of use for Zyvox.

71.     In response, Pfizer told the FDA it would stop using the journal advertisement and that all other Zyvox promotion materials that could raise similar concerns were discontinued or revised. Further, at the FDA's request, Pfizer agreed to publish a corrective advertisement.

- 17 -

72.    This was not an isolated incident of off-label promotions.    According to whistleblower complaints, Pfizer aggressively marketed Zyvox for off-label treatments and claimed, without any support, that it was clinically superior to its competition. For instance, Pfizer instructed Zyvox sales representatives to contact vascular surgeons, even though vascular surgeons would have little or no reason to use Zyvox for its indicated use.

73.    In fact, as part of the settlement, Pfizer was forced to admit that it "did not provide adequate guidance to its sales force regarding what statements were permissible..." and "[a]s a result, Pfizer's sales personnel thereafter continued to make claims to physicians that Zyvox was superior to vancomycin [the competitor drug]."

74.    This off-label promotion of Zyvox caused significant harm to the Company. Almost $98 million of the record $2.3 billion settlement was due to Pfizer's off-label marketing of Zyvox.

### Lyrica

75.    The FDA approved Lyrica for treating nerve pain.  From September 1, 2005 through October 31, 2008, however, Pfizer inappropriately promoted it for a variety of other pains, such as chronic and perioperative pain, as well as for migraines.

76.    In addition, Pfizer directed sales representatives to claim that Lyrica was more effective than competitor drugs, even though there were no studies to support this.  Pfizer also sponsored studies which raised non-FDA approved indications as additional use for Lyrica.

77.    This off-label promotion of Lyrica caused significant harm to the Company. More than $48 million of the record $2.3 billion settlement was due to Pfizer's off-label marketing of Lyrica.

### Kickbacks

78.    Between January 2001 to December 2004, Pfizer paid illegal remuneration to health care providers through speaker program, mentorships, trips, gifts and other means, to induce them to prescribe to prescribe Geodon, Bextra, Zyvox, Lyrica, Aricept, Celebrex, Lipitor, Norvasc, Relpax, Viagra, Zithromax, Zoloft and Zyrtec in violation of the federal anti-kickback statute.

79.    Nearly $50 million worth of the $2.3 billion is due to the illegal kickback scheme

at Pfizer.

## *The Settlement*

80.    On September 2, 2009, the world learned of the full extent of the illegal actions

that were occurring at Pfizer of the past 8 years. Pfizer released a press release which stated:

> Pfizer Inc today announced that it has finalized a previously reported agreement
> in principle with the U.S. Department of Justice (DOJ) to settle an investigation
> regarding past off-label promotional practices related to Bextra, which Pfizer
> voluntarily withdrew from the market in 2005. The final agreement also resolves
> other DOJ investigations involving alleged past off-label promotional practices
> concerning Zyvox, Geodon and Lyrica, allegations related to certain payments to
> healthcare professionals involving these and nine other Pfizer medicines, and
> several related qui tam actions....
>
> In addition, the company has reached agreements with attorneys general in
> 42 states and the District of Columbia to settle state civil consumer protection
> allegations related to its past promotional practices concerning Geodon. The
> company will pay a total of $33 million to the settling states and will take a
> charge in that amount to third-quarter 2009 earnings.
>
> "These agreements bring final closure to significant legal matters and help
> to enhance our focus on what we do best – discovering, developing and delivering
> innovative medicines to treat patients dealing with some of the world's most
> debilitating diseases," said Amy W. Schulman, senior vice president and general
> counsel of Pfizer. "*We regret certain actions taken in the past*, but are proud of
> the action we've taken to strengthen our internal controls and pioneer new
> procedures so that we not only comply with state and federal laws, but also meet
> the high standards that patients, physicians and the public expect from a leading
> worldwide company dedicated to healing and better health. Corporate integrity is
> an absolute priority for Pfizer, and we will continue to take appropriate actions to
> further enhance our compliance practices and strengthen public trust in our
> company."
>
> Under the agreement with the DOJ, Pfizer will pay a previously disclosed
> total of *$2.3 billion ($1.0 billion in civil payments related to a number of
> medicines, and a $1.3 billion criminal penalty related only to Bextra), and a
> Pfizer subsidiary, Pharmacia & Upjohn Company, Inc., will plead guilty to one
> criminal count of violating the U.S. Food, Drug, and Cosmetic Act* related to its
> past promotion of Bextra. A portion of the civil payments will be distributed to
> 49 states and the District of Columbia pursuant to agreements with each state's
> Medicaid division.
>
> The terms of the DOJ settlement require Pfizer to pay approximately $503
> million to resolve civil allegations concerning past promotional practices related

to Bextra. In addition, the company will make payments to resolve other civil allegations involving past promotional practices as follows: approximately $301 million for Geodon, approximately $98 million for Zyvox, and approximately $50 million for Lyrica. The settlement also includes a civil payment of approximately $48 million to resolve allegations relating to certain payments to healthcare professionals involving nine other Pfizer medicines.

Pfizer expressly denies all of these civil allegations, *with the exception that Pfizer acknowledges certain improper actions related to the promotion of Zyvox*.

As part of the DOJ settlement, Pfizer has entered into a Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the U.S. Department of Health and Human Services (HHS). The CIA institutes certain new measures and requires Pfizer to continue maintenance of a corporate compliance program for a period of five years.

Pfizer's existing compliance program includes a dedicated chief compliance officer, corporate compliance committee, code of conduct, extensive compliance training, policies and procedures regarding the appropriate promotion of Pfizer's products, auditing and monitoring, a compliance hotline and extensive procedures to investigate and remediate potential issues of non-compliance with company policy or applicable legal requirements. Pursuant to the CIA, Pfizer will engage an Independent Review Organization (IRO) that will help the company assess and evaluate its promotional and product-related business functions.

The CIA memorializes additional voluntary initiatives that reflect the company's efforts toward greater transparency such as Pfizer's plan, announced in February 2009, to disclose publicly its financial relationships with physicians, medical organizations and patient advocacy groups, including investigators who conduct clinical research. Pfizer is the first biopharmaceutical company to commit to reporting payments for conducting Phase I-IV clinical trials in addition to disclosing payments for speaking and consulting. Although Pfizer was subject to a prior CIA, it has consistently and voluntarily strengthened its compliance program beyond those requirements, including enhancements to the company's comprehensive product risk assessment and mitigation process and compliance monitoring operations.

81.    As stated above, Pfizer's subsidiary, Pharmacia, agreed to plead guilty to a felony violation of the FDCA for misbranding Bextra with the intent to defraud or mislead. Pfizer will pay a criminal fine of $1.195 billion, the largest criminal fine ever imposed in the United States for any matter. Further, Pharmacia will forfeit $105 million, for a total criminal resolution of $1.3 billion.

82.     Pfizer has also agreed to pay $1 billion to resolve allegations that the Company illegally promoted drugs for off-label use and that it paid health care providers illegal kickbacks to induce them to prescribe a number of Pfizer's drugs.

83.     Mike Loucks, acting U.S. Attorney for the District of Massachusetts commented on the settlement, stating "The size and seriousness of this resolution, including the huge criminal fine of $1.3 billion, reflect the seriousness and scope of Pfizer's crimes. ***Pfizer violated the law over an extensive time period***. Furthermore, at the very same time Pfizer was in our office negotiating and resolving the allegations of criminal conduct by its then newly acquired subsidiary, Warner-Lambert, ***Pfizer was itself in its other operations violating those very same laws. Today's enormous fine demonstrates that such blatant and continued disregard of the law will not be tolerated***."

84.     Further, Pfizer and the DOJ entered into another superseding five year Corporate Integrity Agreement.  The Company also agreed to a number of "Administrative Resolutions" designed to create enhanced accountability and increased transparency.   These resolutions include:

        (a)     that the Audit Committee will annually review the Company's compliance program and certify its effectiveness;

        (b)     that Pfizer notify doctors about the global settlement and establish a mechanism doctors can use to report questionable conduct by any Pfizer representative; and

        (c)     that the Company post on its website information about payments to doctors, such as honoraria, travel, or lodging.

85.     This is the first Corporate Integrity Agreement to require a pharmaceutical manufacturer to identify potential risks associated with promoting individual products and that it implement a plan to mitigate the identified risks.

86.     If Pfizer fails to comply with its obligations, it risks exclusion from Federal health care programs and monetary penalties.

87.     The      DOJ      has      constructed      a      website      located      at http://www.stopmedicarefraud.gov/pfizerfactsheet.html which details the specific use each drug

was approved for, and the off-label use Pfizer promoted. The information from this website is reproduced below:

**Bextra**

| FDA Approved Indications | Off-Label Uses Promoted |
|---|---|
| – Osteoarthritis | – Acute pain |
| – Adult rheumatoid arthritis | – Various types of surgical pain |
| – Primary dismennorhea | – Dosages above approved maximum |

**Geodon**

| FDA Approved Indications | Off-Label Uses Promoted |
|---|---|
| – Schizphrenia | – Depression |
| – Acute manic or mixed episodes associated with bipolar disorder | – Bipolar maintenance |
| – Geodon Intramuscular is indicated for treatment of acute agitation in schizophrenic patients for whom treatment with Geodon is appropriate | – Mood disorder |
| | – Anxiety |
| | – Aggression |
| | – Dementia |
| | – Attention Deficit Hyperactivity Disorder |
| | – Obsessive compulsive disorder |
| | – Autism |
| | – Posttraumatic stress disorder – Unapproved patient populations (including pediatric and adolescent patients) |
| | – Dosages above approved maximum |

**Zyvox**

| FDA Approved Indications | Off-Label Uses Promoted |
|---|---|
| – Vancomycin-Resistant *Enterococcus faecium* infections | – Infections caused by methicillin-resistant *Staphylococcus aureus* ("MRSA") generally, rather than only those types of MRSA infections for which Zyvox was FDA-approved |
| – Nosocomial pneumonia | |
| – Community-acquired pneumonia | |
| – Complicated skin and skin structure infections (including diabetic foot infections without | |

concomitant osteomyelitis)

**Lyrica**

**FDA Approved Indications**
 – Adjunctive therapy for adults
with partial onset seizures

– Management of post-herpetic
neuralgia

– Management of neuropathic
pain associated with diabetic
peripheral neuropathy

– Fibromyalgia

**Off-Label Uses Promoted**
– Chronic pain

– Neuropathic pain

– Perioperative pain

– Migraine

## DAMAGES TO PFIZER CAUSED BY DEFENDANTS

88.    As a result of the Individual Defendants' improprieties, Pfizer has expended and
will continue to expend significant sums of money.  Such expenditures include, but are not
limited to:

(a)    the *$2.3 billion* paid to settle claims with the DOJ arising from the illegal
promotion of its pharmaceutical products, the largest health care fraud settlement ever;

(b)    the additional $33 million paid to 42 states and the District of Columbia to
settle investigations that it violated state anti-kickback and false claims laws;

(c)    costs incurred in investigating the complaints of wrongdoing made by the
whistleblowers and governmental agencies;

(d)    costs incurred in defending itself in the whistleblower litigation
concerning its promotional practices; and

(e)    costs incurred from compensation and benefits paid to the Individual
Defendants who have breached their duties to Pfizer.

89.    Moreover, these actions have irreparably damaged Pfizer's corporate image and
goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

90.    Plaintiff brings this action derivatively in the right and for the benefit of Pfizer to
redress the breaches of fiduciary duty and other violations of law by the Individual Defendants.

91.    Plaintiff will adequately and fairly represent the interests of Pfizer and its shareholders in enforcing and prosecuting its rights.

92.    The Board currently consists of the following fourteen individuals: defendants Ausiello, Brown, Burt, Cornwell, Horner, Kilts, Kindler, Mead, Johnson, and directors Stephen W. Sanger, M. Anthony Burns, William H. Gray III, George A. Lorch, William C. Steere Jr. ("Steere").    Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons.

93.    Defendants Ausiello, Brown, Burt, Cornwell, Horner, Kilts, Kindler, Mead, and Johnson are interested because they face a substantial likelihood of liability for knowingly choosing not to act to stop and prevent further violations of federal laws in the face of numerous and overwhelming facts alerting them to what was occurring at the Company.    These facts include:

(a)    the 3 settlements where Pfizer paid approximately $500 million with the U.S. government over violations of the very same laws;

(b)    the four DDMAC letters sent to Pfizer stating that the Company was misleadingly and illegally promoting some of these very same drugs for off-label use. Furthermore, DDMAC sent its July 20, 2005, letter regarding the off-label promotions of Zyvox directly to the Chairman of the Company. However, Pfizer still illegally promoted Zyvox for off-label use for nearly 3 years after receiving the letter.    As part of the settlement, Pfizer admitted that it "did not provide adequate guidance to its sales force regarding what statements were permissible";

(c)    the blatant and widespread violations of law at the Company, as underscored by the eleven different whistleblower actions that were filed between 2006 and 2009. Further, at least seven of the whistleblowers claim that Pfizer retaliated against them, including terminating them, for opposing Pfizer's illegal off-label promotion in violation of the Corporate Integrity Agreements and the Board's requirement under its code to encourage the reporting of any illegal or unethical behavior and take steps to ensure the Company informs employees that Pfizer will not allow retaliation for reports made in good faith; and

(d)     the meetings the Board had with the compliance officer to review the Company's compliance with federal laws regarding drug promotion that the 2004 Corporate Integrity Agreement mandated occur at least semi-annually. A review of compliance matters would require a discussion of the widespread internal reports of the Company's off-label promotions.

Despite these facts, Ausiello, Brown, Burt, Cornwell, Horner, Kilts, Kindler, Mead, and Johnson consciously failed to act to stop and prevent further violations of the federal applicable laws explained herein. Therefore, a reasonable doubt is raised as to whether Ausiello, Brown, Burt, Cornwell, Horner, Kilts, Kindler, Mead, and Johnson can impartially and disinterestedly consider a demand.

94.     As alleged above, defendants Ausiello, Brown, Burt, Cornwell, Horner, Kilts, Kindler, Mead, and Johnson are required to follow the Company's Code which has been in place since at least 2004 and has remained virtually unchanged. Additionally, defendants Brown, Burt, Cornwell, Horner, and Mead stated to the OIG that they would follow the Code as part of the 2004 Corporate Integrity Agreement. The Code requires each of the Company's directors to "comply, and oversee compliance by employees, officers, and other directors, with laws, rules and regulations applicable to the Company." Further, the Code requires directors to "deal fairly … and oversee fair dealing by employees and officers, with the Company's customers, suppliers, competitors and employees." Despite this Code, however, Pfizer's off-label and kickback scheme occurred over 8 years, was widespread, and affected nearly aspect of the Company.

95.     During the Relevant Period, defendants Ausiello, Cornwell, and Johnson served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter in place from 2004 to 2009, the directors on the Audit Committee are charged with, *inter alia*, oversight of the Company's compliance with legal or regulatory requirements, which includes compliance with FDA regulations, the FDCA and the anti-kickback laws. Further, the Audit Committee is charged with ensuring the adequacy and effectiveness of the Company's internal controls. Defendants Ausiello, Cornwell and Johnson breached their fiduciary duties of loyalty and good faith because the Audit Committee failed in its duties, causing Pfizer to illegally

promote off-label use for its drugs, and provide doctors with kickbacks in exchange for prescribing these drugs and took no action to prevent or stop these violations despite the numerous facts listed above. Therefore, defendants Ausiello, Cornwell and Johnson face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

96.    The principal professional occupation of defendant Kindler is his employment with Pfizer as its President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. Thus, a reasonable doubt is raised that defendant Kindler lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

97.    By the Board's own admission in the Company's proxy filed with the SEC on March 13, 2009, Steere lacks independence. Specifically, Steere is the former CEO and Chairman of the Company, pursuant to which he has received substantial monetary compensation and other valuable benefits. Further, Steere is currently the Chairman Emeritus of the Company, pursuant to which he earns director fees of at least $275,000 per year. Thus, in accordance with the Board's own admission, a reasonable doubt is raised that Steere lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

98.    Plaintiff has not made any demand on shareholders of Pfizer to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Pfizer is a publicly held company with over 6.7 billion shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties with Respect to Their Management and Oversight of the Company's Business

99.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

100.    As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of Pfizer and because of their ability to control the business and corporate affairs of Pfizer, owed Pfizer fiduciary obligations of due care, good faith, and loyalty, and were and are required to use their utmost ability to control and manage Pfizer in a fair, just, honest, and equitable manner.

101.    The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by failing in their enumerated duties which caused the violations of federal and state law that led to the $2.3 billion fine imposed on the Company.

102.    But for the abdication of the Individual Defendants fiduciary duties, the Company would not have been damaged.  Accordingly, all of the Individual Defendants breached their fiduciary duties.

103.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### Against the Officer Defendants for Unjust Enrichment in Connection with their Management of the Company's Business

104.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.    By their wrongful acts and omissions, the Officer Defendants were unjustly enriched at the expense of and to the detriment of Pfizer.  In particular, the Officer Defendants were unjustly enriched as a result of the bonuses and other incentive compensation that they achieved as the increased sale of Pfizer's drugs for off-label uses.  On information and belief, but for the off-label promotions, the Officer Defendants would not have achieved their annual incentive compensation goals.  Accordingly, because the Officer Defendants' meeting of their

- 27 -

compensation goals was the result of off-label uses of drugs rather than sustainable growth of Pfizer's business, the Officer Defendants were unjustly enriched by the bonuses and other incentive compensation that they received.

106.    Plaintiff, as a shareholder and representative of Pfizer, seeks restitution from the Officer Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Officer Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

B.    Directing Pfizer to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Pfizer and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of Pfizer to nominate at least three candidates for election to the Board;

3.    a proposal to ensure the accuracy of the qualifications of Pfizer's directors, executives and other employees; and

4.    a proposal to appropriately test and then strengthen the internal control functions.

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Individual Defendants' assets so as to assure that Plaintiff on behalf of Pfizer has an effective remedy;

D.    Awarding to Pfizer restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 15, 2009                    LAW OFFICES OF THOMAS G. AMON

_____
THOMAS G. AMON (TGA – 1515)

250 West 57th Street, Suite 1316
New York, New York 10107
Telephone: (212) 810-2430
Facsimile: (212) 810-2427

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
MARC M. UMEDA
FELIPE J. ARROYO
KELLY M. MCINTYRE
DAVID L. MARTIN
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

Attorneys for Plaintiff

426822

## VERIFICATION

I, James Kenney, hereby declare as follows:

I am a shareholder of Pfizer, Inc. I was a shareholder at the time of the wrongdoing complained of and I remain a shareholder. I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of Pfizer, Inc. I have reviewed the Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: Sept. 15, 2009

JAMES KENNEY